# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 7 |
| **JOHN MICHAEL DUTTON,** | Case No. 4:16-bk-03966-SHG |
| | Chapter 7 |
| **EVELYN MARIE DUTTON,** | Case No. 4:16-bk-03964-SHG |
| Debtor. | |
| **RHEA & WILFRED FISHER,** | Adv. Case No. 4:16-ap-00367-SHG |
| Plaintiffs, | |
| v. | Adv. Case No. 4:16-ap-00366-SHG |
| **JOHN MICHAEL DUTTON,** | **MEMORANDUM DECISION AFTER TRIAL RE: (1) DETERMINATION OF DISCHARGEABILITY UNDER §523(a)(2)(A); AND (2) IMPOSITION OF CONSTRUCTIVE TRUST** |
| **EVELYN MARIE DUTTON,** | |
| Defendants. | |

Rhea and Wilfred Fisher filed adversary complaints to determine the dischargeability of their debt against John and Evelyn Dutton, the debtors in separate individual Chapter 7 bankruptcy cases. The Court consolidated the Fishers' adversary complaints and conducted a two-day trial. After consideration of the evidence and relevant law, the Court finds for the Fishers and awards them a nondischargeable

1

judgment, pre-judgment and post judgment interest, and a constructive trust over the Maricopa House.

## I. <u>JURISDICTION</u>

Jurisdiction is proper under 28 U.S.C. §§ 1334 and 157(b)(2)(J).[1]

## II. <u>PROCEDURAL HISTORY</u>

On April 13, 2016, John Michael ("John") and Evelyn Marie ("Evelyn") Dutton (collectively, the "Duttons") filed separate voluntary petitions for bankruptcy relief (the "Petition Date") under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").[2]

On July 29, 2016, Rhea ("Rhea") and Wilfred ("Wilfred") Fisher (Collectively, the "Fishers") filed separate identical adversary complaints against the Duttons individually.[3] On September 25, 2016, the Court consolidated the adversary proceedings against the Duttons (DE 21[4]). On December 20, 2017, the Court entered the order setting the consolidated adversary proceeding for a two-day trial (the "Trial") (DE 82). On February 13 and 14, 2018, the Court conducted the Trial (DE 101; 103). At the conclusion of the Trial, the Court took the matter under advisement (DE 103).

## III. <u>FACTS</u>

### A. Events Precipitating the Sale of the Utah House

Rhea is eighty-three (83) years old (DE 104, Tr. 7:21). Wilfred was approximately eighty-six (86) years old in January of 2017 when he passed away (Id., Tr. 9:4–5). The Fishers were married from 1968 until Wilfred's death in January of 2017

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. § 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037.

[2] Chapter 7 Voluntary Petition, *In re John Michael Dutton*, No. 16-03966-SHG (Bankr. D. Ariz. Apr. 13, 2016), (cited *infra* as *In re JMD*) DE 1; Chapter 7 Voluntary Petition, *In re Evelyn Marie Dutton*, No. 16-03964-SHG (Bankr. D. Ariz. Apr. 13, 2016), (cited *infra* as *In re EMD*) DE 1. Docket entries are cited as "DE" and Claims Register entries are cited as "CR."

[3] Complaint, *Fisher v. Dutton*, No. 16-ap-00367 (Bankr. D. Ariz. Jul. 29, 2016), DE 1; Complaint, *Fisher v. Dutton*, No. 16-ap-00366 (Bankr. D. Ariz. Jul. 29, 2016), DE 1.

[4] Citations to the docket in the consolidated adversary proceedings are found in *Fisher v. Dutton*, No. 16-ap-00366.

(Id., Tr. 7:22–8:2). Although the Fishers' marriage produced no children, they each entered the marriage with five (5) children (Id., Tr. 8:07–10).

From July 2006 to January of 2014, the Fishers lived together in the home they owned in Bountiful, Utah (the "Utah House") (Id., Tr. 8:16–18; 9:2–3). The Fishers owned the Utah House free and clear and lived on Wilfred's modest retirement pension (Id., Tr. 8:07–10; *In re JMD*, DE 86, Ex. B(2) at 2).

Since at least 2010, Wilfred's health and mental capacity showed signs of deterioration (DE 104, Tr. 9:4–5; 9:20–10:6; 89:10–16). By 2014, Wilfred "had lost his ability to take care of himself[,]" requiring Rhea to function has Wilfred's primary caretaker (Id., Tr. 11:7–18). As Wilfred's health deteriorated, Rhea—herself at an advanced age—found it increasingly difficult to care for Wilfred alone (Id., Tr. 11:20–12:3). Wilfred's care required Rhea to, among other things, physically lift and bathe him (Id., Tr. 11:13–18). A task, which—more than once— resulted in accidents requiring Rhea to seek the assistance of neighbors (Id., Tr. 11:20–23). After concluding that "she couldn't do [it] anymore[,]" Rhea determined that the only options available to her and Wilfred were to "either go into a rest-home[,] assisted living, or go to one of my daughters to live" (Id., Tr. 11:20–24).

Evelyn is one of Rhea's five (5) daughters (Id., Tr. 8:07–10). Evelyn and John married in 2006 and divorced in 2011 (Id., Tr. 116:1–8).[5] Prior to the purchase of the Maricopa House (defined below), Evelyn lived with John in a home they owned in Phoenix, Arizona (the "Phoenix House") (Id., Tr. 116:17–19). Because of Wilfred's declining health, the Fishers and Duttons decided to "pool [their] resources and buy a home together" in Arizona (Id., Tr. 144:11–12; *see* 11:20–12:3; 124:7–13). The Duttons agreed to provide the Fishers with "daily living assistance, such as meals, medication

---

[5] The Duttons testified that despite their divorce, they remain "married" by virtue of their marriage ceremony previously conducted in the Mormon church. The Court will only recognize the validity and legal significance of marriages that comply with applicable state law. *See Moran v. Moran*, 188 Ariz. 139, 143, 933 P.2d 1207, 1211 (Ct. App. 1996); *Gamez v. Indus. Comm'n*, 114 Ariz. 179, 184, 559 P.2d 1094, 1099 (Ct. App. 1976).

3

management, bathing, dressing, transportation, and a home to dwell in for the rest of their lives" (Id., Tr. 137:18–138:2).  In return, the Fishers agreed to provide the down payment for the purchase of the new house in which they would all live together (Id., Tr. 64:8–10).

Shortly thereafter, Evelyn selected a house in Maricopa (the "Maricopa House"), but John alone entered into a purchase agreement for the new home (Id., Tr. 12:10–11; *see* Ex. 1; 11[6]).  On June 14, 2014, the Fishers sold the Utah House; the Phoenix House, however, remained on the market (Id., Tr. 13:3–10).  The Fishers netted approximately $185,000 from the sale of the Utah House to fund their contribution to the down payment on the Maricopa House (the "Down Payment") (Trial Ex. 1).  Upon the sale of the Utah House, the Fishers briefly moved into the Phoenix House with the Duttons with the intention of subsequently residing in the Maricopa House after the close of that purchase (DE 104, Tr. 13:3–10).

Soon after the Fishers arrived at the Phoenix House, problems arose with the Duttons.  The parties presented conflicting evidence as to the amount of down payment contribution initially agreed to by the Fishers.  It is undisputed, however, that the Fishers' down payment $120,000 was greater than the amount they initially agreed to contribute before their sale of the Utah House (*See* Id., Tr. 14:13–18; 138:13–17; DE 105, Tr. 54:3–12).[7]  It is also undisputed that the Down Payment was entirely comprised of proceeds from the Fishers' sale of the Utah House (*In re JMD*, DE 86, Ex. B(2) at 2; Trial Ex. 2; 11).

Rhea testified that soon after they moved into the Phoenix House her relationship with Evelyn "fell apart" (DE 104, Tr. 21:12).  Both parties provided testimony that there

---

[6] No purchase contract was admitted in evidence, however, documentation relating to the loan and security agreement reflect that only John was the borrower in the transaction.

[7] Rhea testified that the Fishers had agreed to $30,000 initially, but after the sale of the Utah House, their required contribution rose to $120,000 (DE 104, Tr. 15:2–12).  Evelyn testified that when the Fishers' contribution to the Down Payment rose from $100,000 to $120,000 it was because there was a delay in closing the Phoenix House which lead to cash shortfall (Id., Tr. 138:13-139:4).  When the sale on the Phoenix House closed, the Duttons netted roughly $51,000, but never refunded any portion to the Fishers (Id., Tr. 141:21–142:16).  The Duttons filed their bankruptcy petition in 2016.

4

was conflict over Evelyn's various requests for additional money from Rhea for the costs for living expenses (Id., Tr. 22:1–6; 94:17–95:6; 134:17–22; *see* DE 105, Tr. 60:2–9). On June 30, 2014, escrow closed on the Maricopa House (*See* Trial Ex. 1). Within a week, Rhea moved into the Maricopa House while Wilfred remained with the Duttons in the Phoenix House until the sale of that house closed (DE 104, Tr. 23:25–24:4).

Shortly after Rhea moved into the Maricopa House, the Fishers decided to make an investment with Jaret Krum ("Jaret") (Id., Tr. 26:10–39:22; 107:18–108:5). Jaret is the son of Pauline Krum ("Pauline"), another of Rhea's daughters and Evelyn's sister. The Fishers wired Jaret approximately $60,000 as their investment (Id., Tr. 39:4–6). The morning of the wire transfer, Evelyn took Wilfred to Chase Bank ("Chase") where he and Rhea held a joint checking account (the "Joint Account") (Id., Tr. 126:2–11).[8] A Chase employee—after speaking with Wilfred and Evelyn—determined that Wilfred was suffering from Rhea's alleged "elder abuse" (Id., Tr. 27:2–4). The Chase employee further determined that Wilfred was a "vulnerable adult" and could not control the funds in the Joint Account by himself (Id., Tr. 127:10–19; *see* 38:2–10). Chase closed the Joint Account and opened a new account replacing Rhea as a signer with Evelyn (Id., Tr. 127:10–19; 100:18–101:4).[9] Chase transferred virtually all of the funds in the Joint Account (the "Transferred Funds") into the new bank account controlled only by Wilfred and Evelyn (Id.).

Rhea learned that the Joint Account was closed while attempting to buy groceries (Id. Tr. 26:17–21). Rhea contacted Chase immediately to determine why the Joint Account was closed (Id., Tr. 26:22–23). A Chase employee explained that Chase closed the Joint Account due to allegations that she abused Wilfred (Id., Tr. 26:22–27:6). Rhea contacted Evelyn and a disagreement ensued over control of the Transferred Funds.[10]

---

[8] What exactly transpired at Chase is disputed, however, these are the undisputed facts.

[9] The parties dispute whether the Joint Account was "frozen" or closed. Nevertheless, it is undisputed that Chase transferred virtually all of the funds in the Joint Account to the new account, inaccessible to Rhea.

[10] The facts of surrounding this disagreement are disputed. It is undisputed, however, that Evelyn never voluntarily relinquished control of the Transferred Funds.

Rhea returned to the Maricopa House and contacted Pauline and two of her other daughters (Id., Tr. 28:11–20). The next day, Pauline flew to Arizona from her home in California (Id., Tr. 30:22–31:3; 32:10–11). Together Rhea and Pauline went to the Phoenix House to remove Wilfred from Evelyn's control (Id., Tr. 32:14–15). Evelyn forced them to leave, and Wilfred remained at the Phoenix House (Id., Tr. 33:2–9).

Rhea and Pauline went to the police station seeking help to remove Wilfred from Evelyn's control (Id., Tr. 33:18–19). They returned to the Phoenix House to pick up Wilfred (Id., Tr. 33:17–25). They suspected that Wilfred was alone in the house (Id., Tr. 34:11–16). Pauline climbed over the fence and entered through the back door (Id., Tr. 34:18–20). She opened the front door for Rhea (Id.). They checked for Wilfred and left when they discovered he was not there (Id., Tr. 35:1).

Rhea and Pauline—now greatly concerned for Wilfred—returned to the police station seeking help (Id., Tr. 35:21–25). The police directed them to the Chandler Municipal Court where they obtained an order of protection against Evelyn (Id., Tr. 36:1–25). Rhea and Pauline returned to the Phoenix House—escorted by police—and removed Wilfred from Evelyn's control (Id., Tr. 37:1–13).

Rhea then returned to Chase with Wilfred (Id., Tr. 37:16). At this point, Rhea learned that Jaret had returned the $60,000 she sent him to the new account controlled by Evelyn (Id., Tr. 39:3–10). Rhea and Wilfred closed the Evelyn controlled account and Chase issued them a cashier's check for the account balance (Id., Tr. 38:24–39:2). The Fishers then moved into Pauline's home in California for approximately fifteen (15) months (Id., Tr. 39:23–40:4). They subsequently moved to Montana and lived with Rhea's daughter, April Fulbright ("Fulbright") (Id., Tr. 40:18–22). Rhea and Wilfred lived with Fulbright until his death. Rhea continues to reside with Fulbright today (Id.).

The Duttons closed the sale on the Phoenix House and moved into the Maricopa House following Rhea and Wilfred's departure (See Id., Tr. 24:11–13). Within a few months, the Duttons refinanced the Maricopa House twice, borrowing almost $70,000

against the equity created by the Fishers' Down Payment.[11]

In 2014, the Fishers filed an action against the Duttons in the Maricopa County Superior Court alleging claims for breach of contract, fraud, unjust enrichment, and violation of duty to a vulnerable adult (*In re JMD*, DE 86, Ex. B(2) at 7–15). In their state court action the Fishers' sought judgment for $120,000; the imposition of a constructive trust; and the award of pre and post judgment interest on the $120,000 (Id. at 15). The filing of the Duttons' bankruptcy petitions stayed the Fishers' state court action. The Fishers subsequently filed these adversary proceedings objecting to discharge of their claims against the Duttons.

## IV. LEGAL STANDARD

The Supreme Court ruled that "the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Generally, the burden of proving an exception to discharge under § 523(a)(2), (4) and (6) is on the creditor. *See In re Niles*, 106 F.3d 1456, 1461 (9th Cir. 1997).

## V. DISCUSSION

### A. The Trial Testimony and Credibility

The Fishers argue that the Duttons fraudulently induced them to advance the Down Payment by: (1) concealing the fact that they had been divorced since 2011; and (2) falsely promising to repay or omitting their intention not to repay the Down Payment in the event their plan to live together failed (*In re JMD*, DE 106 at 2).

The Duttons' defenses are: (1) Rhea knew their marital status at the time the Fishers advanced the Down Payment; and (2) Rhea gave them the Down Payment as an unconditional gift without any promise of repayment.

---

[11] The Duttons initially applied the Down Payment to the $215,000 purchase price of the Maricopa House and John Dutton financed the remaining $95,000 (Trial Ex. 1). The Duttons acknowledged at trial that they subsequently borrowed approximately $60,000 to construct a swimming pool at the Maricopa House (DE 105, Tr. 48:24–49:9). In 2015, the Duttons consolidated these mortgages into a single loan of $162,181 (Trial Ex. 8).

7

At the Trial, the parties offered testimony and exhibits in evidence. The Fishers presented testimony from the Duttons, Pauline, and Fulbright. The Duttons presented the testimony of William Fisher ("William"), Evelyn's stepbrother and Wilfred's son; Marilyn Peterson ("Peterson"), Evelyn's older sister and Rhea's daughter; and Tiffany Robinson ("Robinson"), Evelyn's daughter from previous relationship. The Duttons also presented the testimony of Todd Porter ("Porter"), the Fishers' real estate agent in connection with the sale of the Utah House.

Reviewing courts in this Circuit "give particular deference to the bankruptcy court's credibility findings given the bankruptcy court's ability to view firsthand the witnesses' demeanor and tone on the witness stand." *In re McClain*, No. AP 1:14-AP-01058-VK, 2017 WL 3298418, at *4 (B.A.P. 9th Cir. Aug. 2, 2017) (citing *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010)). The bankruptcy court's factual findings are not disturbed by the reviewing court unless they are "illogical, implausible, or without support in the record." *Id*. (citing *Retz*, 606 F.3d at 1199).

The plaintiff in an action under § 523(a)(2)(A) must establish the debtor's intent to defraud. Because direct evidence of an intent to defraud is rarely available, the bankruptcy court may establish the requisite intent from the surrounding circumstances. For this reason, the Court addresses both the general credibility of the witnesses and their credibility as to specific issues.

### 1. The Gift Letter

Rhea testified that the Fishers never intended the Down Payment to be an unconditional gift. "We did not make that a gift . . . it was not a gift[; i]t was a down payment on a home for us to live in, not an unconditional gift" (DE 104, Tr. 64:8–10). Rhea explained that the Fishers' intention was to sell the Utah House and fund the Down Payment so that she would have place to live until her death (Id., Tr. 22:8–10). Rhea also testified that their agreement with the Duttons required the Fishers to pay for food, utilities, internet, and television (Id., Tr. 22:16–24).

8

The Duttons' defense relied on the fact that Rhea and Wilfred signed a gift letter (the "Gift Letter") just prior to closing John's loan transaction to purchase the Maricopa House.  Rhea testified that the Duttons told her: "it's illegal in Montana to borrow the down payment.  So Mother, you cannot tell anyone that this -- that you gave us -- that we borrowed the money from you.  It has to be a gift" (Id., Tr. 17:20–23).[12]  Rhea testified that when she asked, "well, then how are you going to guarantee my investment?  John said, don't worry about it.  I will take care of you.  You know I will take care of you[,]" however, Rhea maintains that she "didn't know [she] signed a *gift paper*" (Id., Tr. 17:23–18:2 (emphasis added)).

The Duttons' reliance on the Gift Letter's preclusive effect is misplaced.  First, the Gift Letter is a pro forma document generated by John's lender and signed by both John and the Fishers (Trial Ex. 11).  The Gift Letter evidences an enforceable promise made by John to his lender.  It is not an enforceable promise as between the Duttons and the Fishers.  Second, the Gift Letter contains virtually no terms.

Arizona law permits "courts to consider all of the proffered evidence to determine its relevance to the parties' intent.  As long as the contract language is reasonably susceptible to the interpretation asserted by its proponent and not contradictory to the language in the contract, parol evidence will be admissible." *In re Mortgages Ltd.*, 559 B.R. 508, 517 (Bankr. D. Ariz. 2016).  Here, the lack of any terms in the Gift Letter compels this Court to consider parol evidence of the circumstances surrounding its execution.

Additionally, "Arizona law plainly provides that parol evidence is admissible to prove fraud in the inducement claims and that an integration clause does not bar such claims." *Pettennude v. McHenry*, No. 2:07-CV-2071-HRH, 2008 WL 11338798, at *4 (D. Ariz. Aug. 25, 2008).  Here, the Fishers allege fraud in the inducement, and therefore, may present parol evidence. *See In re Fox*, No. 13-30321 (JAM), 2017 WL 564499, at *5 (Bankr. D. Conn. Feb. 10, 2017) ("By verbally assuring the Plaintiff that she would repay

---

[12] Rhea likely confused Montana for Arizona.

the home loan and that the Plaintiff could live at the Property rent free, the Defendant manipulated the Plaintiff into signing the Gift Letter with no intention of ever repaying the home loan. By convincing the Plaintiff to sign the Gift Letter, the Defendant could assert—as she did in this case—that the $25,000.00 was a gift and not a loan, despite her many representations to the contrary.")

The Duttons presented testimony from Evelyn, Porter, William, and Robinson to demonstrate that Rhea was at various times allegedly unkind and callous to Wilfred. Pauline and Fulbright, however, gave contradictory testimony that Rhea's periodic "ugly" words were the result of her frustration with Wilfred's deteriorating physical and mental condition (DE 104, Tr. 102:22). While the Duttons' witnesses' anecdotal testimony is largely taken as credible, Rhea's alleged mistreatment of Wilfred is not relevant to the determination whether the Duttons violated § 523(a)(2)(A) in this case. Further, while the Duttons' witnesses may have established that Rhea is capable of being an unpleasant person, they failed to undermine Rhea's cognitive abilities or demonstrate dishonesty. The Court concludes that Rhea was credible witness even though she sometimes testified inaccurately about specific dates or locations. Overall, she was believable and her testimony was consistent and supported by logic and other evidence.

### 2. Evelyn and John

Evelyn and John were not credible for numerous reasons. First, their "unconditional gift" defense is both logically and legally inconsistent. Evelyn and John offered conflicting testimony to support its proposed effect. The Duttons maintained the Fishers gifted the Down Payment without any conditions attached to transfer of the funds (DE 105, Tr. 57:3–4; *see* DE 104, Tr. 135:15–20). Then, in contradiction of the "unconditional gift" defense, they both testified that the Fishers advanced the Down Payment with the expectation they would always have a "home to grow old in" until their death (DE 104, Tr. 137:18–22; DE 105, Tr. 49:22–47:14). To prevail under the "unconditional gift" defense, the Duttons had to prove the Fishers sold the Utah House then—while in their eighties and without a home in which to live—"unconditionally"

10

gifted $120,000 of the sale proceeds to the Duttons *without any* expectation of value in return. The Duttons' testimony in support of these contradictory positions simply lacks believability.

Notwithstanding the implausibly of their testimony, the Duttons' defense of an "unconditional gift" is not supported by the evidence. "The essential elements of a gift *inter vivos* are that the donor manifest a clear intent to give to the party claiming as donee, and give to the latter before death, full possession and control of the property. There must be a donative intent, delivery, and a vesting of irrevocable title upon such delivery." *O'Hair v. O'Hair*, 109 Ariz. 236, 239 (1973) (Emphasis added).

The evidence established, however, that the Down Payment was not an irrevocable gift for several reasons. First, John testified there was an agreement that the Fishers could reside in the property as a condition of the gift. Second, John testified that if the sale of the Maricopa House did not close he would return the Down Payment (DE 105, Tr. 68:18–25). John's testimony establishes that the Fishers did not "irrevocably" transfer the Down Payment to the Duttons for their discretionary use. Rather, the Fishers' advanced the Down Payment for the limited purpose of purchasing the Maricopa House—with the understanding that they would have the right to live there until their death. This undisputed evidence undermines the necessary elements of full possession and control as required to establish donative intent. Thus, the Court finds the Down Payment was not—as the Duttons suggest—an irrevocable gift.

The Duttons testimony raised additional credibility concerns. The Fishers presented uncontroverted testimony of Evelyn's history of graft. Rhea testified that "Evelyn told me . . . that she and John separated, because they [] their daughter . . . needed mouth surgery and . . . if they were together they couldn't afford the dental care. . . . [b]ut if they separated, then . . . they could claim state funds" (DE 104, Tr. 19:18–22). Pauline testified that Evelyn "frequently" engaged in various forms of insurance fraud and boasted about having multiple "social security numbers from different names that she would use" (Id., Tr. 70:6–20). Both Evelyn and John testified that John quitclaimed the

Maricopa House to Evelyn without notifying the lenders even though they knew this violated the loan agreements (Id. Tr. 145:6–146:22; DE 105, Tr. 49:12–53:8). It appeared that Evelyn manipulated facts or changed her testimony to suit her purposes. Her testimony often contradicted undisputed, contrary evidence. The Court finds she was not a credible witness.

Similarly, other evidence diminished John's credibility. John admitted on cross-examination that he routinely filed criminal complaints against adverse parties. John admitted that he filed criminal complaints against the Fishers' counsel and his law partner (DE 105, Tr. 65:11–12). John admitted that he filed a criminal complaint against a police officer who ticketed him for a traffic violation (Id., Tr. 64:12–17). John admitted he filed criminal complaints against two Maricopa County Judges that ruled against him in civil matters (Id., Tr. 65:13–15). John also admitted that he filed criminal complaints against Pauline and Rhea after they came to the Maricopa House to remove Wilfred from Evelyn's control (Id., Tr. 64:12–17). These specific incidences of John's conduct raise questions about character for truthfulness based on his frequent assertion of dubious claims. *See* Fed. R. Evid. 405(b).

John's testimony about the first meeting of creditors raised additional concerns regarding his credibility. John was asked on cross-examination, "[d]o you recall that you attended an initial meeting of creditors in your bankruptcy case" (Id., Tr. 66:20–21). John responded, "that meeting never took place . . . I was never sworn under oath" (Id., Tr. 66:22–23). John made patently false statements under oath despite notice of the Fishers' intent to admit the transcript of the first meeting of creditors at the Trial (*In re JMD*, DE 92 at 11). The transcript of the meeting of creditors clearly establishes that the meeting took place, John attended, Johns was "sworn under oath", and questioned by the Fishers' counsel (Trial Ex. 15). John's testimony demonstrates that he lies in the face of undisputed evidence to the contrary. John's propensity to make untrue statements, to assert unfounded claims and to present inconsistent testimony eviscerated his credibility.

12

**B. § 523(a)(2)(A)**

Under § 523(a)(2)(A), a bankruptcy court may except from discharge a debt for money, property, services or credit obtained by false pretenses, a false representation or actual fraud from discharge. "[T]he Ninth Circuit has consistently held that a creditor must demonstrate five elements to prevail on any claim arising under § 523(a)(2)(A). The five elements, each of which the creditor must demonstrate by a preponderance of the evidence, are: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." *In re Slyman,* 234 F.3d 1081, 1085 (9th Cir. 2000) (internal citations omitted).

### 1. A Misrepresentations and Fraudulent Omissions by the Duttons
#### i. Concealing their Divorce and the Titling of the Maricopa House

The Fishers argue that the Duttons concealed their marital status resulting in John obtaining title to the Maricopa House as an unmarried man. Rhea testified that Evelyn only disclosed that she had separated from John but not divorced (DE 104, Tr.19:18–22). The Duttons argued that Evelyn informed Rhea of her marital status prior to the purchase of the Maricopa House (Id., Tr.65:2–5). The Duttons further argue that Rhea had knowledge of their marital status because Rhea and Wilfred are listed as John's "future mother-in-law" and "future father-in-law" on the Gift Letter (Id., Tr.64:15–11; Trial Ex. 11).

Rhea maintained: (1) that no such discussion with Evelyn ever occurred; (2) she did not remember signing the Gift Letter; and (3) she did not learn about the Duttons' marital status through it (DE 104, Tr.65:1; 65:7–11). In support of the Fishers' argument, Pauline testified that she too was not aware of the Duttons' marital status at the time the Fishers advanced the Down Payment (Id., Tr. 84:7–9). The Duttons presented testimony from John and Robinson, both alleging that they held conversations with Rhea about a

13

about the Duttons' future wedding plans in Las Vegas (DE 105, Tr. 72:24–73:9; 84:22–85:9). Peterson also testified that she spoke to Rhea about the Duttons' marital status (Id., Tr. 23:16–24:13).

The Court found none of the testimony in support of the Duttons credible. Peterson's testimony about her conversation with Rhea was vague to the extent that she was unsure of the year it took place, the location where she was residing in at the time, and important details about the conversation. John and Robinson testified about having virtually the same conversation with Rhea about a reconciliation marriage—that never happened—casting doubt on their testimony as well.

Although Pauline's testimony was frank and credible, it does little to prove the Duttons concealed their marital status from Rhea. Rhea's testimony—while also believable—raised concerns. The Duttons' cross-examination flustered Rhea as if she could not fully comprehend some of their questions. Considering Rhea's confusion on the witness stand and the fact that the Duttons continued to live together after their divorce, it is possible Rhea knew of the divorce and simply forgot. Although the Duttons provided no credible evidence that Rhea knew about their marital status, they do not have burden of proof on this issue. The Fishers had to demonstrate by a preponderance of the evidence that the Duttons concealed their marital status. The Fishers failed to meet the burden of proof. Thus, the Court finds that the Fishers failed to establish that the Duttons made a fraudulent misrepresentation or omission regarding their marital status.

### ii. False Promises and Omission Regarding the Down Payment

The Fishers also argue that to induce them to advance the Down Payment, Evelyn made a false promise to repay, while John fraudulently omitted his intention never to repay. Evelyn claimed that she never promised to repay the Down Payment while John relied on the Gift Letter as conclusive proof of Fishers' intention to make an irrevocable gift. As discussed above, the Fishers' advance of the Down Payment did not constitute an irrevocable gift.

14

The Fishers presented testimony from Pauline and Fulbright to prove that Evelyn promised to repay the down payment. Pauline testified that Evelyn assured her that in the event the plans fell apart "she wouldn't keep mom's money; and she would give that back to her" (Id., Tr. 71:7–72:12). Fulbright testified that Evelyn assured her that in the event the plan fell apart she would rectify the situation (Id., Tr. 96:8–15). In Fulbright's words, Evelyn told her "if they need to leave, we will make it right" (Id.).

The Duttons presented testimony from Porter and William that the Fishers intended to "irrevocably gift" the Down Payment. William testified that he believed the advance of Down Payment was intended to be an irrevocable gift based on his knowledge of FHA guidelines (DE 105, Tr.11:16–12:5). Porter testified that he explained to Rhea the meaning of the Gift Letter and made it clear that the Fishers would not get the Down Payment back (DE 104, Tr. 189:15–24). On the Fishers' cross-examination, Porter, however, also testified that Rhea told him that no matter what the outcome John agreed to take care of her and honor their agreement (Id., Tr. 178:6–22).

The witnesses for both the Fishers and Duttons were credible. Although Pauline and Fulbright's testimony is sufficient to establish that the Fishers did not intend to "irrevocably gift" the Down Payment, it falls short of establishing that there was a promise to repay. Although William's testimony was credible, he had no knowledge of the agreement between the Fishers and Duttons. As a result, William's testimony is not helpful in determining the intention of the parties in this transaction. Porter's testimony established that in the event the plan failed Rhea did not expect the Duttons to return the Down Payment, however it also established that in such an event Rhea expected the Duttons to compensate her and Wilfred somehow.

Considering all of the evidence presented, the Fishers failed to prove that Evelyn promised to repay the Down Payment as a loan in the event the plan failed. But, that is not to say that the evidence supports the Duttons defense of irrevocable gift. On cross-examination, the Duttons themselves elicited undisputed testimony from Fulbright that Evelyn told her on numerous occasions that she could not repay the Down Payment

15

because that would constitute mortgage fraud.[13]  Fulbright's testimony establishes that Evelyn never intended to repay the Down Payment.[14]

"A false representation can be established by an omission when there is a duty to disclose." *In re Eashai*, 87 F.3d 1082, 1089 (9th Cir. 1996).  A duty to disclose arises between parties to a business transaction when one holds information regarding "matters known to him that the other is entitled to know because of a . . . relation of trust and confidence." Restatement (Second) of Torts § 551(2)(a) (1977); *see Eashai*, 87 F.3d at 1089 (looking to the Restatement to determine duty to disclose in an action under  § 523(a)(2)(A)); *In re Apte*, 96 F.3d 1319, 1324 (9th Cir. 1996) (same).  The commentary to the Restatement expressly includes family members as those standing in a relation of trust and confidence. Restatement (Second) of Torts § 551 (1977) ("Members of the same family normally stand in a fiduciary relation to one another").  The Duttons had a duty to disclose their intention to the Fishers.  The Duttons never attempted to prove that Evelyn or John disclosed their intention not to repay to the Fishers at any time prior to their advance of the Down Payment.

The evidence convincingly establishes that the Duttons induced the Fishers to advance the Down Payment with a promise.  The Duttons promised the Fishers a home and care for the rest of their lives or compensation of some sort should that become untenable.  The evidence also establishes that Evelyn had a duty to disclose her intention to never repay the Down Payment and treat it as an irrevocable gift.  Evelyn's omission of her intention constitutes a fraudulent omission of material fact for purposes of § 523(a). *In re Harmon*, 250 F.3d 1240, 1246 n. 4 (9th Cir.2001) ("A debtor's failure to disclose material facts [also] constitutes a fraudulent omission under § 523(a)(2)(A)"); *see In re Cossu*, 410 F.3d 591, 597–98 (9th Cir. 2005) (omissions are representations).

---

[13] DE 104, Tr. 108:6–14 (Duttons: "Did [Evelyn] -- did I tell you over and over and over again that this would be mortgage fraud if I were to repay back a down payment as a loan, as you kept telling me I needed to do?" Fulbright:  "Yeah. [she] did.")

[14] The Court does not determine whether Evelyn's statement about mortgage fraud is legally correct.

Even if Evelyn's omission is not imputed to John, in his own testimony plainly proclaimed that he never intended to repay the Down Payment (DE 105, Tr. 43:18–44:7). John's failure to disclose his intention to the Fishers, however, before they advanced the Down Payment also constitutes a fraudulent omission of material fact for purposes of § 523(a). The Court finds that while the Fishers failed to establish that they "loaned" the Duttons the Down Payment, the evidence establishes that they advanced the Down Payment under an agreement with theDuttons and not as an irrevocable gift.

### 2. The Duttons' Knowledge of the Deceptiveness of Their Fraudulent Omission

The Duttons testified that they never intended to repay Rhea under any circumstances. The record demonstrates that the Duttons never disclosed this fact to Rhea. Pauline and Fulbright testified that the Duttons falsely promised to compensate the Fishers if things did not work out. The Duttons' statements to Pauline and Fulbright are inconsistent with their testimony that they never intended to compensate the Fishers. The Duttons' statements to Pauline and Fulbright were false at the time they made them. The Duttons' omission with regard to Rhea in conjunction with their false statements to Pauline and Fulbright prove they knew of the falsity of their representations.

### 3. The Duttons' Intention to Deceive the Fishers

"Intent to defraud is a question of fact." *In re Kennedy*, 108 F.3d 1015, 1018 (9th Cir. 1997), *as amended* (Mar. 21, 1997) (citing *In re Rubin*, 875 F.2d 755, 758 (9th Cir. 1989). "[I]ntent may properly be inferred from the totality of the circumstances and the conduct of the person accused." *In re Ormsby*, 591 F.3d 1199, 1206 (9th Cir. 2010); *accord Kennedy*, 108 F.3d at 1018. "The Ninth Circuit . . . ha[s] recognized that reckless disregard for the truth of a representation satisfies the element that the debtor has made an intentionally false representation in obtaining credit." *In re Kong*, 239 B.R. 815, 826 (B.A.P. 9th Cir. 1999) (citing *In re Anastas*, 94 F.3d 1280, 1286 (9th Cir. 1996)).

It is crucial to emphasize that "misrepresentation is not an element of actual fraud under § 523(a)(2)(A). That is, actual fraud may include a wider array of misconduct." *In*

17

*re Phillips,* No. AP 15-01052-TWD, 2016 WL 7383964, at *5 (B.A.P. 9th Cir. Dec. 16, 2016) (citing *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016)). "For a debt to be excepted from discharge, the debtor must actually intend to defraud the creditor." *In re Tripp,* 357 B.R. 544, 548 (Bankr. D. Ariz. 2006) (citing *In re Tsurukawa*, 258 B.R. 192, 198 (B.A.P. 9th Cir. 2001)). "[D]irect evidence of an intent to deceive[, however,] is rarely shown." *Id.* As a result, Courts in this Circuit "recognize[] that the element of intent to deceive under § 523(a)(2)(A), can be inferred and established from the surrounding circumstances." *In re Hultquist*, 101 B.R. 180, 183 (B.A.P. 9th Cir. 1989); *accord In re Campbell*, 490 B.R. 390, 401 (Bankr. D. Ariz. 2013).

"The court must consider whether the totality of the circumstances paints a picture of deceptive conduct by the debtor that indicates an intent to deceive the creditor." *Tripp*, 357 B.R. at 549 (citation omitted). "Because no single objective factor is dispositive, the assessment of intent is, thus, left to the fact-finder." *Id.* (citing *In re Jacks*, 266 B.R. 728, 741–43 (B.A.P. 9th Cir. 2001)); *In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989). In its analysis, a court "should [not only] consider the debtor's conduct at the time of the representations" but rather the debtor's "subsequent conduct to the extent that it provides an insight into the debtor's state of mind at the time of the representations." *Tripp*, 357 B.R. at 548 (citations omitted); *accord In re Singh*, No. ADV 12-01045-AA, 2014 WL 3883304, at *6 (B.A.P. 9th Cir. Aug. 7, 2014).

The circumstantial evidence presented during the Trial establishes that the Duttons intended to deceive the Fishers. First, the Duttons falsely characterized the Gift Letter to Rhea as a legal requirement.[15] The Duttons' demand that the Fishers sign a gift letter was not a legal requirement for purchase of the Maricopa House. The Fishers advanced the Down Payment and yet, they retained no legal rights in the funds, nor their proceeds. The Gift Letter suggests a scheme for the Duttons to obtain sole ownership and control of the Fishers' property.

---

[15] *See* discussion *supra* at 9.

Any appropriate transaction would have transferred at least some ownership rights to the Fishers in exchange for the Down Payment. Evidence established that the Duttons knew how and willingly to transferred ownership in the Maricopa House between them to protect their rights.[16] The Duttons falsely asserted there were legal impediments to co-ownership with the Fishers based on John financing the Maricopa House purchase. But, miraculously these same impediments did not prevent them from co-owning or transferring ownership of the same house without disclosure to the mortgage lenders to protect their interests.

This is most clearly evidence by the fact that John quitclaimed title to the Maricopa House to Evelyn soon after the final loan closed. The Duttons could have just as easily purchased the Maricopa House and quitclaimed an interest in the title to the Fishers. Alternatively—and more appropriately—the Duttons could have purchased the Maricopa House jointly with the Fishers. Nevertheless, the Duttons' insistence on the use of the Gift Letter is proof of their intent to defraud.

The Duttons refinanced the Maricopa House to install a lavish swimming pool months after they purchased the home. The fact that the Duttons immediately leveraged the Maricopa House for cash demonstrates there was no financial impediment to returning at least half of the Down Payment to the Fishers almost immediately the purchase was completed. These facts only raise more questions as to why the Fishers were "required" to contribute all of the Down Payment in the first place. All of these circumstances suggest the Duttons' intention was to defraud the Fishers.

Evelyn's closing of the Joint Account and the substitution of her name for Rhea's on the new account holding the Transferred Funds is evidence of fraud. At the time Chase closed the Joint Account, Rhea and Wilfred had been married for approximately forty-six (46) years. The Transferred Funds belonged to both of them jointly and severally and they had a right to do with them as they chose.

---

[16] *See* DE 105, Tr. 48:1–5; DE 104, Tr. 146:4-10 (both Duttons discussing the need for quitclaim due to potential risk of John's death while riding his motorcycle).

The Court finds that these uncontroverted facts are illustrative of Evelyn's intent to defraud the Fishers. Rhea discovered the closure of the Joint Account while she was attempting to purchase groceries. She subsequently learned that since the Joint Account was closed, Evelyn had obtained control of the Transferred Funds. Evelyn did not immediately contact Rhea to inform her of the closure of the Joint Account Evelyn refused to return Rhea's access to the money. To retrieve the Transferred Funds, Evelyn forced Rhea to secure an order of protection executed with the assistance of the police.

Evelyn's closure of the Joint Account and her attempted control of the Transferred Funds not only demonstrates Evelyn's intent to control the Fisher's liquid assets, but suggest that the Duttons intended to execute a more pernicious plan to purchase the Maricopa House by having the Fishers advance the Down Payment and then fleece them of their remaining funds. When considered together, the totality of circumstances compels the Court to conclude that the Duttons intended to deceive the Fishers.

### 4. The Fishers' Reliance was Justifiable

The standard of what reliance is justifiable "is not that of the average reasonable person" rather "it is a more subjective standard which takes into account the knowledge and relationship of the parties themselves." *In re Kirsh*, 973 F.2d 1454, 1458 (9th Cir. 1992). As a result, "a person of normal intelligence, experience and education may not put faith in representations which any such normal person would recognize at once as preposterous. At the same time, the standard does protect the ignorant, the gullible, and the dimwitted, for no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." *Id.* (internal quotes and citations omitted). Justifiable "reliance is judged in light of the totality of the circumstances on a case-by-case basis." *In re Bacino*, 2015 WL 9591904, at *20 (9th Cir.BAP (Cal.), 2015) (citing *Heritage Pac. Fin., LLC v. Raul Machuca, Jr.(In re Raul Machuca, Jr.)*, 483 B.R. 726, 736 (B.A.P. 9th Cir. 2012).

When they advanced the Down Payment, Rhea and Wilfred were approximately seventy-nine (79) and eighty-three (83) years old. Fulbright testified that Wilfred's

mental health had deteriorated to the point where he had "the mind of a three year old" (DE 104, Tr. 98:4).[17]  The record also reflects that on at least one occasion, a representative of Chase bank considered Wilfred a vulnerable adult.  Rhea on the other hand was of sound mind.  During her testimony, however, Rhea's advanced age was apparent.  She would at times not understand questions or answer inappropriately.  Sometimes she confused states and people.  At the end of their lives, the Fishers were retired and supported only by Wilfred's pension income.  Rhea testified she felt that if they did not live with one of her children in the near future she and Wilfred would have to move into in an assisted living facility.  At the very least, the Fishers were vulnerable, elderly adults.

The Fishers relied on the Duttons because of their close familial relationship.  The Fishers' reliance cannot be evaluated through the same lens used to determine the reasonableness of reliance as between parties negotiating at arm's length.  Given the Fishers' age, vulnerability and the familial bond, they appropriately relied on the Duttons' false representations.  Thus, the Court finds the Fishers' reliance on the Duttons' undisclosed intention was justifiable in this case.

### 5. The Duttons' Conduct was the Proximate Cause of the Fishers' Damage

The Duttons' misrepresentations were the proximate cause of the damages suffered by the Fishers.  But for the Duttons' conduct, the Fishers would not have been damaged by the loss of the Down Payment.

### C. Constructive Trust

"A constructive trust is an equitable remedy crafted to prevent a party who has obtained property through unlawful means from benefitting from his wrongdoing." *In re Allied Gen. Agency*, 229 B.R. 190, 195 (D. Ariz. 1998) (internal citations omitted) (citing

---

[17] The Court makes no finding that Wilfred lacked legal capacity because no admissible evidence of his legal capacity was admitted.  For the purposes of this decision, the Court finds that Wilfred was legally capable of entering into an agreement with the Duttons.

*Johnson v. American National Ins. Co.*, 126 Ariz. 219, 222–24 (Ct. App. 1980)).
"Arizona law permits the imposition of a constructive trust whenever title to property has
been obtained through actual fraud, misrepresentation, concealment, undue influence,
duress, or through any other means which render it unconscionable for the holder of legal
title to retain and enjoy its beneficial interest." *In re N. Am. Coin & Currency, Ltd.*, 767
F.2d 1573, 1575 (9th Cir.), *amended*, 774 F.2d 1390 (9th Cir. 1985) (internal quotes
omitted) (citing *In re Estate of Rose*, 108 Ariz. 101, 104, *opinion supplemented on denial
of reh'g*, 108 Ariz. 207 (1972)).

A constructive trust "removes title from the legal owner and conveys that interest
to one to whom it justly belongs" while the "holder of legal title is held to be a trustee for
the benefit of the rightful owner." *Allied Gen. Agency*, 229 B.R. at 196. "Essential to the
imposition of a constructive trust, therefore, is the identification of specific property, or
res, in which the claimant has a direct interest." *Id.* (citing *Burch & Cracchiolo, P.A. v.
Pugliani*, 144 Ariz. 281, 286 (1985)). "In permitting the imposition of a constructive
trust for actions amounting to actual fraud, Arizona law is not inconsistent with federal
bankruptcy law." *N. Am. Coin & Currency, Ltd*, 767 F.2d at 1575.

By establishing the elements of their claim under § 523(a)(2)(A) the Fishers have
satisfied the elements of fraud under Arizona law. *See Comerica Bank v. Mahmoodi*, 224
Ariz. 289, 292 (Ct. App. 2010). Thus, the Court finds that the imposition of a
constructive trust in favor of the Fishers on the Maricopa House in the principal amount
of the Down Payment is the appropriate remedy.

**D. Joint and Several Liability**

At every stage of this case, the Duttons worked in concert together. They lived
together both before and after the purchase of the Maricopa House regardless of their
marital status. The Fishers provided uncontroverted evidence that their divorce is merely
a sham, a financial accommodation. They both made the relevant fraudulent omissions
as part of a scheme in which they both benefitted. The evidence also establishes that they
have transferred ownership of the property at various times between themselves. For

these reasons, the Court finds that the Duttons are jointly and severally liable for the total amount of the judgment entered in this case. *Wiggs v. City of Phoenix*, 198 Ariz. 367, 371 (2000) ("But section 12-2506(D) preserves joint liability for both true joint tortfeasors (those "acting in concert") and those vicariously liable for the fault of others."); *In re Lee*, 536 B.R. 848, 857–58 (Bankr. N.D. Cal. 2015) (non-dischargeable judgment entered against joint tortfeasors who caused same harm).

### E. Prejudgment Interest

"In cases involving liquidated damages such as the one at bar, prejudgment interest is a matter of right." *Dawson v. Withycombe*, 216 Ariz. 84, 113 (Ct. App. 2007) (citing *Trus Joist Corp. v. Safeco Ins. Co. of America*, 153 Ariz. 95, 109 (Ct. App. 1986)). "A claim is liquidated if the evidence makes it possible to calculate the amount with exactness, without reliance on opinion or discretion." *Canal Ins. Co. v. Pizer*, 183 Ariz. 162, 164 (Ct. App. 1995).

Under Arizona law, the allowable rate of prejudgment interest on indebtedness of this kind is ten percent (10%). *Metzler v. BCI Coca-Cola Bottling Co. of Los Angeles*, 235 Ariz. 141, 145 (2014)) (citing A.R.S. § 44-1201(A). "The weight of Arizona law supports the proposition that . . . prejudgment interest should accrue from the date" the plaintiff made demand or "absent a demand letter . . . it should accrue from the date the complaint was filed." *Dawson*, 216 Ariz. at 113.

Here the liquidated measure of damages is the $120,000 advanced by the Fishers to fund the Down Payment. The Fishers filed their complaint in state court on September 9, 2014 (DE 86, Ex. B(2) at 7). Thus, interest appropriately accrues at 10% per year from September 9, 2014 until the entry of this order.

"Under federal law, postjudgment interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [] the date of the judgment." *In re Hamilton*, No. AP 14-90152-CL, 2018 WL 1807279, at *8 (B.A.P. 9th Cir. Apr. 17, 2018) (citing 28 U.S.C. §

23

1961(a)). As a result, the Fishers are entitled to post judgment interest from the date of the entry of a final judgment until it is fully satisfied.

## VI. CONCLUSION

Having considered the testimony and evidence submitted, for the reasons stated above:

**IT IS HEREBY ORDERED** that a non-dischargeable judgment be entered in favor of the Fishers and against Evelyn Dutton and John Dutton jointly and severally in the principal amount of $120,000;

**IT IS FURTHER ORDERED** that prejudgment interest at the rate of 10% per annum pursuant to A.R.S. §44-1201(A) shall accrue on the principal sum of $120,000 from September 9, 2014 until the date of the entry of this Memorandum Decision;

**IT IS FURTHER ORDERED** that post judgment interest shall accrue on the amount of the non-dischargeable judgment, including prejudgment interest, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the entry of the non-dischargeable judgment until paid in full;

**IT IS FURTHER ORDERED** that a constructive trust is imposed on the Maricopa House in favor of the Fishers for the entire amount of the non-dischargeable judgment, including pre and post judgment interest;

**IT IS FURTHER ORDERED** that the Fishers shall upload and notice an appropriate form of judgment that includes the legal description of the Maricopa House and the accrued and accruing pre and post judgment interest within fourteen (14) days of the entry of this Memorandum Decision.

Dated and signed above.

Notice to be sent through the
Bankruptcy Noticing Center "BNC"

to the following:

**MUELLER & DRURY, PC**
PO BOX 42182
MESA, AZ 85274
*Plaintiff Counsel*

**JOHN MICHAEL DUTTON**
2301 HAYES RD
HOUSTON, TX 77077
*Defendant*

**EVELYN MARIE DUTTON**
43694 W COWPATH RD
MARICOPA, AZ 85138
*Defendant*

OFFICE OF THE U.S. TRUSTEE
230 N. 1ST AVENUE, SUITE 204
PHOENIX, AZ 85003

25